**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA,    )
                              )
          Plaintiff,          )
                              )
          v.                )      CIVIL ACTION NO.
                              )      1:09-CV-119-CAP
THE STATE OF GEORGIA, et al.,    )
                              )
          Defendants.     )
_____ )

**RESPONSE TO DEFENDANTS'
MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

Through its Motion to Enforce the Settlement Agreement ("Motion to Enforce"), the State seeks to delay yet again its obligation to comply with the Constitution, federal statutory law, and the terms of the Agreement. And, once again, the individuals who will suffer most from this delay are those who are in most desperate need: individuals with disabilities in the State of Georgia. The Court should deny the State's Motion to Enforce and permit the United States to proceed expeditiously on its Motion for Immediate Relief.

The irony is that the State, not the United States, is the party that has utterly failed to perform its obligations under the Agreement and denies that it is bound by material terms of that Agreement. In its System-wide Comprehensive Audit ("Audit") submitted to the United States on January 15, 2010, the State admits that

it does not provide care and safety that is consistent with constitutional standards in any of the four priority areas at any of the seven hospitals, despite the Agreement's requirement that the State do so by that date.  See Audit, Ex. A, pp. 1-18; Agreement, ¶ V.E; Youngberg v. Romeo, 457 U.S. 307, 320-23 (1982).

Moreover, the State has denied that it has any obligations under the Agreement pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12132-12134, and Olmstead v. L.C., 527 U.S. 581 (1999).  See, e.g., Doc. 36 at 17 (Oct. 28, 2009) ("Olmstead is not part of the Settlement Agreement.").  But the Agreement itself contains two pages of provisions enforcing Olmstead.  See Agreement, ¶ III.F.  Indeed, the United States made clear, when it issued its initial findings on this matter in the last Administration, that the investigation included ADA and Olmstead issues.  See, e.g., Findings Letter for Georgia Regional Hospital at Atlanta ("GRHA"), Ex. B, pp. 3-4 (May 30, 2008) ("GRHA is the very hospital where, nearly a decade ago, the United States Supreme Court made clear that the unnecessary institutionalization of persons with disabilities violates the law.  Olmstead, 527 U.S. 581 (1999)").  The United States reiterated its position that the Agreement required the State to comply with Olmstead and the ADA shortly after the Agreement was filed.  See Doc. 12 at 14-16 ("The Agreement requires compliance with Olmstead and the ADA").  The

State's assertion that the Agreement does not obligate it to comply with <u>Olmstead</u> and the ADA is either a repudiation of a material term of the Agreement, or it indicates that there was no meeting of the minds on a material term of the Agreement.

Fundamentally, however, the State's Motion is of no moment. If the Agreement is in effect, the United States has satisfied the requirements for bringing a motion to enforce that Agreement because, as indicated in the United States' Motion for Immediate Relief, the deficient conditions and practices upon which the United States seeks relief "pose an immediate and serious threat to the life, health, or safety of patients served by the State Psychiatric Hospitals." <u>See</u> Doc. 55 at 23-31; Agreement, ¶ V.D. A fundamental cause of these deficient conditions is the State's failure to comply with <u>Olmstead</u>, and therefore any relief for these conditions must require the State to develop a plan to move individuals from inappropriate institutional confinement. <u>See</u> Doc. 55 at 23-31.

Additionally, the United States has filed a freestanding action pursuant to the ADA that forms an additional basis for its motion for a preliminary injunction, and the State cannot now assert that the United States is precluded from filing this action by the Agreement, as the State has already asserted that Agreement does not include the ADA. <u>See, e.g.</u>, Doc. 36 at 17 (Oct. 28, 2009) ("<u>Olmstead</u> is not part of

- 3 -

the Settlement Agreement."). Accordingly, the State's Motion to Enforce should

be denied.[1]

## I.    FACTUAL BACKGROUND

Since the inception of its investigation in 2007 under the previous

Administration, the United States has consistently taken the position that the State

must meet the requirements of the ADA and Olmstead. Indeed, in one of his first

executive orders upon taking office, President George W. Bush stressed the

importance of states complying with the ADA and Olmstead:

> Unjustified isolation or segregation of individuals with disabilities
> through institutionalization is a form of disability-based
> discrimination prohibited by Title II of the Americans With
> Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq. . . . In
> Olmstead v. L.C., 427 U.S. 581 (1999) . . . , the Supreme Court
> construed Title II of the ADA to require States to place qualified
> individuals with mental disabilities in community settings, rather than
> institutions . . .

"Community-Based Alternatives for Individuals with Disabilities," Exec. Order

No. 13217, 66 Fed. Reg. 33155 (June 18, 2001). President Barack Obama

---

[1]    In any event, the status of the Agreement in this case is unclear. Although
this Court entered the Agreement as an interim order (Docs. 9 and 34), it rejected
the parties' joint motion to enter the Agreement as a final order (Doc. 2). If the
Court ultimately rejects the Agreement and does not retain jurisdiction to enforce
its terms, a material part of the settlement entered into by the parties would not be
met. Indeed, if that were to occur, there is no language in the Agreement, such as a
release of claims, that would bar the United States from bringing suit.

reaffirmed the United States' "commitment to vigorous enforcement of civil rights for Americans with disabilities":  "The <u>Olmstead</u> ruling was a critical step forward for our nation, articulating one of the most fundamental rights of Americans with disabilities:  Having the choice to live independently."  Press Release, The White House, "President Obama Commemorates Anniversary of <u>Olmstead</u> and Announces New Initiatives to Assist Americans with Disabilities" (June 22, 2009).

The United States made clear that its investigation included the State's failure to comply with the ADA and <u>Olmstead</u> in the first letter detailing the constitutional and federal statutory violations the United States found during its investigation.  In the May 30, 2008, Findings Letter regarding Georgia Regional Hospital at Atlanta, issued under the previous Administration, the United States stated that one of the most troubling aspects about its investigation was that:

> GRHA is the very hospital where, nearly a decade ago, the United States Supreme Court made clear that the unnecessary institutionalization of persons with disabilities violates the law. <u>Olmstead</u>, 527 U.S. 581 (1999)

Findings Letter for GRHA ("GRHA Letter"), pp. 3-4 (May 30, 2008).  The GRHA Letter went on to describe numerous violations of the ADA and <u>Olmstead</u>.  See <u>id.</u>, pp. 6-7, 25-27, 45-49, 61-62.

After prolonged negotiations with the State, the United States entered into the Agreement on January 15, 2009.  Material terms to that Agreement included measures designed to bring the State into compliance with the ADA and Olmstead, see Agreement, ¶ III.F, and provisions designed to make the Agreement judicially enforceable.  See Agreement, ¶ V.C.  The Agreement also required the State to come into substantial compliance with the Agreement in four areas by January 15, 2010, because the United States found gross deficiencies in these areas during its investigation that posed an immediate and serious threat to the life, health, and safety of individuals in the State hospitals.  See Agreement, ¶ V.E.  The very nature of these four areas demonstrates the immediate and serious threat posed by these systemic deficiencies:  (a) suicide risk assessment and prevention; (b) prevention of patient on patient assault; (c) implementation of emergency medical codes; and (d) choking and aspiration risk assessment and prevention (the "priority areas").  See id.

The Agreement further requires the State to use its best efforts to obtain substantial compliance with the entire Agreement at the earliest possible date, and it obligates the State to be in substantial compliance at least one year before the expiration of the Agreement, i.e., by January 15, 2013.  See id. ("The State will undertake its best efforts to bring the Georgia Psychiatric Hospitals into

compliance at the earliest possible date and will notify the United States that the

State is in substantial compliance no later than twelve months before the expiration

of the Agreement.").

On the same day that the United States entered into the Agreement with the

State, the United States reiterated that it had found the State in violation of the

ADA and Olmstead:

> Nearly a decade ago, the United States Supreme Court made clear that
> the unnecessary institutionalization of persons with disabilities
> violates the law. Olmstead, 527 U.S. at 587. . . . Despite the mandate
> by the Supreme Court and the subsequent clear analysis and
> recommendations in Georgia's own reports, as indicated herein, our
> review of discharge planning at NWGRH finds that Georgia still
> frequently fails to ensure that patients receive appropriate and
> sufficient services to enable them to live in the most integrated setting
> consistent with their needs, as required by federal law.

Findings Letter for Northwest Georgia Regional Hospital ("NWGRH Letter"),

Ex. C, pp. 3-4 (Jan. 15, 2009).  Like the GRHA Letter, the NWGRH Letter set

forth extensive violations of the ADA and Olmstead.  See id., pp. 6-7, 23-25,

48-52, 65-66.

Shortly after the parties filed the Agreement with the Court, the *amici curiae*

objected to the Agreement.  See Docs. 10 and 11.  Among other concerns, the

*amici curiae* argued that the Agreement did not have sufficient measures to require

compliance with the ADA and Olmstead, and it did not require the State to develop

a specific plan setting forth how it would attain compliance with the Agreement.
See id.

On March 20, 2009, the United States responded to the *amici curiae*'s
objections. Once again, the United States indicated its belief that the Agreement
required compliance with ADA and Olmstead. See Doc. 12 at 14-16. The United
States also indicated that it understood that the State was developing a plan to
implement the Agreement. See id. at 12-13. The State also responded to the *amici
curiae*'s objections and indicated that "the Agreement itself addresses" the *amici
curiae*'s concern that Georgia must "decrease its hospital census by improving
discharge planning and increase community services." Doc. 13 at 15.

On April 6, 2009, the Court ordered the parties to meet with the *amici curiae*
and "to discuss the various issues of concern and attempt to reach a resolution."
Doc. 16. The parties and the *amici curiae* met and, on June 12, 2009, submitted a
Joint Status Report to the Court. See Doc. 26. As memorialized in the Joint Status
Report, the State agreed to develop a plan to implement the Agreement. See id. at
3-6. The Joint Status Report also indicated that the State had agreed to additional
measures to address community-based services, but there was disagreement over
the scope of the measures that the State had agreed to perform. See id. at 6-7. The
parties and the *amici curiae* continued to meet during the summer, including a

meeting addressing the measures the State needed to take to comply with the ADA and Olmstead.

On September 15, 2009, the State filed its initial compliance report and the then-current draft of its plan of implementation. See Doc. 28. The United States and the *amici curiae* responded on September 30, 2009. See Doc. 30. The Joint Status Report of the United States and the *amici curiae* described their grave concerns regarding the State's ability to comply with the Agreement because: (a) the United States continued to find serious harm during its compliance tours of the State hospitals; (b) a fundamental cause of this harm was the State's "unwillingness to take seriously its obligations under Olmstead v. L.C., 527 U.S. 581 (1999), and the discharge planning provisions of the Agreement"; and (c) the plan of implementation revealed the State's lack of progress, failed to address the necessary expansion of community-based services, and showed that the State lacked the necessary staff to implement the Agreement, among other shortcomings. See id.

In its response to the September 30, 2009, Joint Status Report, the State asserted that "Olmstead is not part of the Settlement Agreement," reversing its position from its March 20, 2009, response to the *amici curiae* and denying the position that the United States had taken repeatedly from the inception of its

investigation, at the time the Agreement was entered, and throughout its filings with the Court.  See Doc. 36 at 17.  Shortly thereafter, the United States sought a status conference with the Court because the parties' fundamental disagreement over material terms of the Agreement cast doubt on the Agreement's validity, and because the United States' compliance tours continued to demonstrate that the State was failing to honor its commitments under the Agreement.  See Doc. 37.  As a result of the United States' request, the Court ultimately held a telephonic status conference on December 30, 2009, and instructed the United States to file a motion outlining its concerns.  See Doc. 44.

Because the status of the Agreement was now in doubt, the United States also issued a letter of its findings as to the remaining five hospitals on which it had not previously issued a findings letter, in order to perfect the Court's jurisdiction over all seven State hospitals if the State sought to avoid its obligations under the Agreement.  See Findings Letter for Central State Hospital, East Central Regional Hospital, Southwestern State Hospital, Georgia Regional Hospital at Savannah, and West Central Georgia Regional Hospital, Ex. D (Dec. 8, 2009).  The letter expressly indicated that it was issued pursuant to 42 U.S.C. § 1997b.  See id. at 2 ("In accordance with statutory requirements, we now write to advise you formally of the findings of our investigation, the facts supporting them, and the minimum

remedial steps that are necessary to remedy the deficiencies. 42 U.S.C.

§ 1997b(a).").

On January 15, 2010, the State filed its second compliance report and the

current draft of its plan of implementation ("POI"), and it submitted its Audit and

Quality Management Report ("QM Report") to the United States.  See Docs. 49-

50; Exs. A and E.  The State's POI was a mere six pages in length and contained

virtually no detail, in contrast to the 61-page version that the State submitted on

September 30, 2009, about which the United States and *amici curiae* had grave

concerns.  Compare Docs. 49-50 with Doc. 28.  Moreover, the POI indicated that

the State had not even ***begun*** implementing any provision of the Agreement until

October 19, 2009, and that many provisions of the Agreement had yet to be acted

upon in any way, although the Agreement required the State to begin

implementation immediately.  See Docs. 49-50; cf. Agreement, ¶ IV.A.  It also

revealed that State does not plan on achieving full implementation regarding at

least seven provisions of the Agreement until December 31, 2013, nearly one year

after the State is required to be in substantial compliance with all provisions of the

Agreement.  See id.; cf. Agreement, ¶ V.E.  Instead of indicating a good faith effort

to ameliorate the United States' and the *amici curiae*'s concerns over which there

had been negotiations for more than eight months, the POI confirmed that the State

was in violation of the Agreement and had no intention of honoring its

commitment to developing an adequate plan of implementation as memorialized in

the June 12, 2009, Status Report.

As discussed in more detail in the United States' Motion for Immediate

Relief, the Audit indicates that, by the State's own assessment, it is in breach of the

Agreement because it has not achieved substantial compliance in the four priority

areas.  See Audit, Ex. A, pp. 1-18.  The QM Report reveals that a substantial cause

of this failure is gross levels of understaffing at the State hospitals.  See QM

Report, Ex. E, pp. 7-11, 20-23, 25-27.

Throughout the duration of the Agreement, the State has also been subject to

a Voluntary Compliance Agreement ("VCA") with the United States Department

of Health and Human Services' Office for Civil Rights ("OCR").  See VCA, Ex. F.

The purpose of the VCA was to resolve the complaints of a certain class of

individuals who alleged that they were not being provided with services in the

most integrated setting appropriate to their needs.  See id., Art. 1, § I.  Notably, the

VCA expressly provides that it

> does not address or resolve issues involved in any complaint
> investigation, compliance review, or administrative action under
> Federal laws by other Federal agencies, including any action or
> investigation under Title II of the Americans with Disabilities Act of
> 1990, 42 U.S.C. § 12101 et seq., or Section 504 of the Rehabilitation

> Act of 1973, 29 U.S.C. § 794, or the Civil Rights of Institutionalized
> Persons Act (CRIPA), 42 U.S.C. § 1997, by the United States
> Department of Justice (DOJ) with respect to any matter presented to
> DOJ before or after the date of this Agreement.

Id., Art. 4, § IV.F.  On January 26, 2010, OCR sent a letter notifying the State of its

non-compliance with the VCA and setting forth numerous areas in which the State

was violating the VCA's terms.  See Ex. G.  OCR notified the State of many of

these violations as early as June 3, 2009, and again on October 8, 2009, and

December 8, 2009.  See id. at 2.

On January 28, 2010, the United States filed a Motion for Immediate Relief,

which, because the status of the Agreement was unclear due to the State's denial of

some of its material terms, requested that the State be enjoined to fulfill its

obligations under federal law, and that the motion be treated as a motion for a

preliminary injunction or as a motion to enforce the Agreement, depending on the

status of the Agreement.  See Doc. 55 at 4.  The Motion for Immediate Relief also

sought a preliminary injunction based on the independent ADA case that the

United States filed on the same day and moved to consolidate with the existing

case.  See id.  In no part of the Motion for Immediate Relief did the United States

seek to be relieved of its obligations under the Agreement.  To the contrary, the

United States has asserted that it has fully satisfied the requirements of the

Agreement and may bring the Motion because the conditions and practices that are the subject of the Motion "pose an immediate and serious threat to the life, health, or safety of patients served by the State Psychiatric Hospitals." Id. at 4 & n.2 (citing Agreement, ¶ V.D.). The United States intends to establish that it has satisfied these requirements during the March 1, 2010, Hearing.

## II.    ARGUMENT

Essentially, the State's Motion to Enforce is nothing more than a request for more time—90 more days, to be precise. The State has not provided any reason to grant this delay, however. The State has been aware of United States' concerns with the State's ability to comply with the Agreement at least since the filing of the September 30, 2009, Joint Status Report, see Doc. 30, and the United States provided additional notice of the continuing violations of the Constitution, the ADA, and the Agreement in its December 8, 2009, Letter to Governor Perdue. See Ex. D. Since that time, the State has made little effort to ameliorate the United States' concerns, and at no time has the State attempted to negotiate with the United States or the *amici curiae* about the necessary relief. Indeed, to the contrary, the State has instead denied the United States' authority to enforce the ADA and Olmstead pursuant to the Agreement, despite the United States' consistent position across political administrations that the ADA was central to its

investigation and the Agreement.  The State has also provided documents admitting that it is and will continue to be in violation of the Agreement.

The State's effort to delay these proceedings should be denied.  The Motion to Enforce does not establish any procedural hurdle to the United States' Motion for Immediate Relief.  As the United States will establish during the March 1 Hearing, the United States has fully complied with the Agreement, and the Agreement does not bar any of the relief that the United States is seeking. Moreover, the United States has not requested to be relieved of its obligations under the Agreement.  Rather, the State's actions have demonstrated that:  (a) a material term of the Agreement continues to be in dispute and therefore a valid and binding contract does not exist; and (b) the Agreement has been ineffective in bringing the State into compliance with the Constitution and federal statutory law.

## A.    The State Has Denied or Repudiated a Material Term of the Agreement

In its October 29, 2009, filing with the Court, the State denied that the Agreement included any obligation for it to comply with the ADA and <u>Olmstead</u>. In doing so, the State has either repudiated a material term of the Agreement or has demonstrated that there was no meeting of the minds between the parties on a material term of the Agreement.

- 15 -

It is well settled that "[a] valid and binding contract does not exist unless there is a meeting of the minds on all essential terms." Cohen v. DeKalb County Sch. Dist., No. 1:09-cv-1153, 2009 WL 4261161 at *5 (N.D. Ga. Nov. 25, 2009); see also BellSouth Adver. & Publ'g Corp. v. McCollum, 433 S.E.2d 437, 440 (Ga. Ct. App. 1993) ("[i]f there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement . . . it must follow that a valid and binding contract was not made.") (quoting Jackson v. Easters, 379 S.E.2d 610, 611 (Ga. Ct. App. 1989)). Similarly, if a party repudiates a contractual obligation, the non-repudiating party is discharged from its duties and may rescind the contract. Stephens v. Trust for Public Land, 479 F. Supp. 2d 1341, 1354 (N.D. Ga. 2007) (citing Coffee Butler Serv., Inc. v. Sacha, 366 S.E.2d 672, 673 (Ga. 1988)); Nikas v. Hindley, 106 S.E.2d 335, 339 (Ga. Ct. App. 1958).

From the beginning of the United States' investigation under the previous Administration, the United States has always asserted that its investigation included the ADA and Olmstead. One of the three overarching concerns that the United States listed at the beginning of its first letter of findings to the State was the State's ongoing violation of the ADA nearly ten years after Olmstead was decided, and nearly 20 years after the ADA was passed. See GRHA Letter,

pp. 3-4, 6-7, 25-27, 45-49, 61-62 ("GRHA is the very hospital where, nearly a

decade ago, the United States Supreme Court made clear that the unnecessary

institutionalization of persons with disabilities violates the law. Olmstead, 527

U.S. 581 (1999)"). The United States reiterated this concern in its second letter of

findings to the State, issued the same day that the parties entered the Agreement.

See NWGRH Letter, pp. 3-4, 6-7, 23-25, 48-52, 65-66. Two months after the

Agreement was filed with the Court, the United States once again stated its

position that the Agreement required the State to comply with Olmstead and the

ADA. See Doc. 12 at 14-16 ("The Agreement requires compliance with Olmstead

and the ADA").

Nevertheless, on October 28, 2009, the State filed a brief with the Court that

asserted that "Olmstead is not part of the Settlement Agreement." Doc. 36 at 17.

In doing so, the State directly contradicted the United States' longstanding position

on the scope of its investigation and the terms of the Agreement. Thus, the State's

assertion was either a repudiation of a material term of the Agreement, or it

established that there was no agreement on an essential term of the Agreement. In

either case, the outcome is the same: either there was no valid and binding

contract, see Cohen, 2009 WL 4261161 at *5-*7, or the United States, as the non-

repudiating party, may rescind the contract.  See Stephens, 479 F. Supp. 2d at

1354.

Even if the Agreement is still in effect, however, the United States may still

bring an independent and freestanding claim pursuant to the ADA.  In reaching this

conclusion, the Court need not consider whether an Agreement entered into

pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C.

§ 1997, somehow precludes the United States from asserting any claims against the

State pursuant to the ADA, including any claims the United States may have

because of the State's failure to comply with the VCA.  The State's assertion that

"Olmstead is not part of the Settlement Agreement" itself provides the basis for

this conclusion, because the State cannot now assert that the Agreement somehow

bars the United States from advancing its claims pursuant to Olmstead and the

ADA.  Doc. 36 at 17.  Principles of judicial estoppel prohibit the State from

attempting to gain advantage by asserting inconsistent positions "'according to the

exigencies of the moment.'"  New Hampshire v. Maine, 532 U.S. 742, 749-51

(quoting United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993)).  Essentially,

the State cannot have it both ways:  either the ADA and Olmstead are not part of

the Agreement, in which case the United States may bring its separate complaint,

or they are part of the Agreement and the State must comply with their

requirements.  The State has made clear that it believes that <u>Olmstead</u> and the ADA are not part of the Agreement, and therefore the United States may bring its separate claim.

Accordingly, the State's Motion to Enforce must fail on numerous grounds. Because of the State's assertion that <u>Olmstead</u> is not part of the Agreement, grave doubt exists as to whether the Agreement was ever a valid or binding contract or if the United States may now rescind the contract.  Even if the Agreement is in effect, however, the United States may still bring its claims pursuant to the ADA because the State's assertion precludes it from arguing that the Agreement now bars these claims.

### B.    The State Has Not Complied with the Agreement

As discussed in more detail in the United States' Motion for Immediate Relief, the United States' compliance monitoring tours and the State's recent submissions to the Court and the United States establish that the State continues to be in violation of the Constitution, federal statutory law, and the Agreement. Because the Agreement has proven ineffective, the United States does not intend to pursue a renewed motion for the Court to enter the Agreement.  Moreover, the State's recent submissions indicate that it does not intend to honor its commitment

to the United States, the *amici curiae*, and the Court to develop a plan to implement the Agreement.

The State's own POI filed January 15, 2010, establishes that the State has not complied with the terms of the Agreement or with its commitment to develop an adequate plan in the June 12, 2009, Joint Status Report.  The POI indicated that the State had not even begun implementing any provision of the Agreement until October 19, 2009, and that many provisions of the Agreement had yet to be acted upon in any way.  See Docs. 49-50.  This is in direct violation of the Agreement, which required the State to begin implementation immediately.  See Agreement, ¶ IV.A.  It also indicated that the State does not plan on achieving full implementation regarding at least seven provisions of the Agreement until December 31, 2013.  See Docs. 49-50.  The Agreement, however requires the State to be in substantial compliance with all of its provisions not later than January 15, 2013.  See Agreement, ¶ V.E.

Additionally, in the June 12, 2009, Joint Status Report, the State committed "to develop a concrete implementation plan that will lay out specific actions the State will take to achieve each element of the Agreement, the person(s) responsible for the actions, the dates by which the outcomes will be achieved, measures of progress/compliance, and the anticipated date for compliance."  The State's initial

plan of implementation filed on September 15, 2009, while insufficient, was at least a step in the right direction.  See Doc. 28.  The current POI, however, is only six pages in length and does not list the "specific actions the State will take to achieve each element of the Agreement, the person(s) responsible for the actions, the dates by which the outcomes will be achieved, [or the] measures of progress/compliance," contrary to the State's commitments in the June 12, 2009, Joint Status Report.  See Docs. 49-50.

Moreover, the State's Audit indicates that, by the State's own assessment, it is in breach of the Agreement because it has not achieved substantial compliance in the four priority areas by January 15, 2010, as required.  See Audit, Ex. A, pp. 1-18; cf. Agreement, ¶ V.E.  Indeed, the Audit reveals that some State hospitals have made no progress toward achieving substantial compliance with steps necessary to protect individuals' life, health, and safety in the four priority areas. See id.  These deficient conditions and practices "pose an immediate and serious threat to the life, health, or safety of patients served by the State Psychiatric Hospitals," and the remedy for these conditions must include a plan to move individuals from inappropriate and harmful institutional confinement.  See Doc. 55 at 23-31; Agreement, ¶ V.D.

Thus, while the State argues that it has made a good faith effort to comply with the Agreement and ameliorate the United States' concerns, the State's own documents and actions belie that assertion.  Without any substantial evidence suggesting that the State is making the necessary efforts to come into compliance with the Agreement, the United States does not intend to pursue a renewed motion for the Court to enter the Agreement.  Indeed, the United States was left with little recourse other than to file the Motion for Immediate Relief in an attempt to force the State to come up with a concrete plan to achieve compliance with the Constitution, the ADA, and other federal statutory law in a timely manner.  The United States would like nothing better than for the State to engage in this process voluntarily, but so far the State has demonstrated that it is unwilling or unable to do so.

## III.   CONCLUSION

The State's attempt to delay the proceedings before this Court through its Motion to Enforce should be denied.  It is the State, not the United States, that has denied its obligations under material terms of the Agreement and that has not satisfied its obligations under the Agreement.  The Agreement is therefore of doubtful validity and, in any event, has proven ineffective.  Accordingly, the

State's Motion to Enforce the Settlement Agreement should be denied and the

Court should proceed with hearing the United States' Motion for Immediate Relief.

Respectfully submitted,

FOR THE UNITED STATES:

SALLY Q. YATES
Acting United States Attorney
Northern District of Georgia
600 United States Courthouse
75 Spring Street, SW
Atlanta, GA  30303

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
Principal Deputy Assistant Attorney General
Civil Rights Division

SHANETTA Y. CUTLAR
Chief
Special Litigation Section

JUDITH C. PRESTON
Deputy Chief
Special Litigation Section

_____/s/ (Express Permission)_____
MINA RHEE [GA Bar 602047]
Assistant United States Attorney
Northern District of Georgia
600 United States Courthouse
75 Spring Street, SW
Atlanta, GA 30303
Tel: (404) 581-6302
Fax:  (404) 581-6163
Email: Mina.Rhee@usdoj.gov

_____/s/ Timothy D. Mygatt_____
MARY R. BOHAN [DC Bar 420628]
TIMOTHY D. MYGATT [PA Bar 90403]
ROBERT A. KOCH [OR Bar 072004]
EMILY A. GUNSTON [CA Bar 218035]
SAMANTHA K. TREPEL [DC Bar 992377]
Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC  20530
Tel:  (202) 305-2302
Timothy.Mygatt@usdoj.gov

**Local Rule 7.1D Certification**

By signature below, counsel certifies that the foregoing document was

prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.


      /s/ Timothy D. Mygatt
Timothy D. Mygatt
Attorney
Special Litigation Section

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed the foregoing RESPONSE TO DEFENDANT'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties in this matter via electronic notification or otherwise:

Mark H. Cohen
Special Assistant Attorney General
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308

Josh Belinfante
Special Assistant Attorney General
RobbinsLaw LLC
999 Peachtree Street, N.E.
Atlanta, GA  30309

Jason S. Naunas
Mark J. Cicero
Assistant Attorneys General
State Law Department
132 State Judicial Building
40 Capitol Square, S.W.
Atlanta, GA  30334-1300

Kenneth S. Canfield
Doffermeyer, Shields, Canfield & Knowles, LLC
1355 Peachtree St., Suite 1600
Atlanta, GA  30309

Ira A. Burnim
Alison N. Barkoff
Bazelon Center for Mental Health Law
1101 15th St. NW, Suite 1212
Washington, DC  20005

Joshua H. Norris
Georgia Advocacy Office, Inc.
150 E. Ponce de Leon Avenue, Suite 430
Decatur, GA  30030

This 22nd day of February, 2010.

    /s/ Timothy D. Mygatt
TIMOTHY D. MYGATT
Attorney
Special Litigation Section